NATHANIEL WEED, HARVEY WEED AND HENRY W. BARNES, *v.* JOSHUA TERRY.

Where two parties claim the same land under conflicting titles, and there is a doubt as to which title is valid, that fact is a sufficient consideration for an agreement to compromise and divide the land: and a specific performance of such agreement will be decreed, where there has been no fraud or unfairness.

And this, though the agreement be by parol, if there has been a part performance to take it out of the statute of frauds.

Where the parties to such an agreement had made choice of a third person to make the division, and both attended and taken part in it, and one of them had delivered possession to the other of the portion set off to him, and had permitted the latter to make repairs upon it, lease it, receive the rent and profits, and pay the taxes, *it was held*, that there had been such part performance.

Equity will not compel the specific performance, by a husband, of his agreement to procure his wife to join him in the conveyance of real estate.

APPEAL from Chancery. For a report of the case in that court see Walk. Ch. R. 501, where the pleadings and evidence are given somewhat at length.

The case was briefly this: The complainants and the defendant each claimed under conflicting titles " Pontiac village lots, 11, 12, 13, 34, 35 and 36 *of the sub-division of out lots* 14, 15, 16, 25 *and* 26, according to the plat of the same in the registers office for the county of Oakland, in book M of deeds, p. 199."

The complainants claimed through a deed from the sheriff of Oakland county, executed March 30, 1842, in consummation of a sale of the premises to them, March

28, 1840, by virtue of an execution in their favor, against Robert Le Roy and Samuel C. Monson.    The execution was regularly levied upon the premises above described, February 4, 1840, but, by mistake of the sheriff, in the entry of the levy, and in the notice which was given of the sale, the premises were incorrectly described—the words *italicised* in the above description being omitted, and page 119 of book M being stated as the place of record of the plat, whereas there was no record of any portion of Pontiac village plat on any other page of said book except page 199.    It appeared also that the lots were sold together and not separately.

Terry, the defendant, claimed title to the premises through a deed of the same executed to him by Robert Le Roy and wife, in March 1840, after the levy, and before the sale to complainants, for the consideration of $1400, under which deed he entered into possession soon after its execution.

In the summer of 1840, Terry made a proposal to the complainants, through H. C. Knight their attorney, for an amicable arrangement of their claims to the premises, by an appraisal and division in proportion to their respective demands on Le Roy—he stating his claim to be about $1,100.    This proposition was afterwards agreed to by the complainants, and such acquiescence made known to Terry, who still adhered to the proposition.    After a long delay, and about the 1st of March 1842, Terry agreed with Knight upon William McConnell to appraise and divide the property, in pursuance of said agreement.    Soon afterwards the appraisal and division was made by McConnell—Terry being present and participating therein—and lots 11 and 12 fell to the share of the complainants, and 13, 34, 35 and 36 to Terry.    After the division Terry said it was fair and he was satisfied with it, and it was then agreed that deeds should be executed by the parties to

each other, and that in the mean time each should take possession of their respective portions. One Hunt was then in possession of all the lots as the tenant of Terry, and, as the year for which they had been let to him was then about to expire, Terry was to receive the rent, and Knight, as agent of complainants, agreed to let lots 11 and 12 to Hunt for another year, for $100 rent, in case Hunt should not remain upon the farm he owned. Hunt actually occupied the premises under this agreement, for about a fortnight after the expiration of his lease from Terry, when he went to reside on his farm, and the premises were leased by Knight to one Miles, and from that time until the filing of the bill in this case, the complainants, or persons claiming under them, remained in possession, and during the time paid taxes and expended some money in improvements upon the lots.

In April 1842, in pursuance of the agreement by which each party was to quit claim to the other their respective lots, a quit claim deed of lots 13, 34, 35 and 36 from complainants to Terry, was drawn up by Knight, and sent to the complainants in New York, and by them returned to Knight duly executed, with instructions to deliver it to Terry, on receiving from the latter a quit claim deed of lots 11 and 12. This deed of the complainants was tendered to Terry on or about the 1st of June 1842, when he refused to execute the agreement.

Soon after this deed was forwarded to New York a quit claim deed from Terry and wife to complainants of the other lots, was drawn up by Knight, at the request of Terry, which Terry promised to execute with his wife, when Mr. Whittemore, with whom he desired it should be left, should call at his house for that purpose. Afterwards, in Whittemore's presence, he refused to execute the deed, saying that he had been advised not to do so.

Thereupon the bill in this case was filed by complain-

ants, praying for a specific performance by Terry of his agreement, &c. An answer was filed by Terry and proofs taken.

On the hearing in the court below, the Chancellor decreed that the defendant should execute, acknowledge and deliver to complainants, a quit claim deed of lots 11 and 12, with a covenant against his own acts, and procure his wife to join therein or release her right of dower, on receiving a like deed, executed and acknowledged by complainants, for the other lots ; and that the defendants should pay complainants their costs.

From this decree the defendant appealed to this court.

*T. Romeyn,* for the defendant, appellant.

*O. D. Richardson,* for the complainants appellees.

WHIPPLE, J., delivered the opinion of the court.

I do not deem it necessary to consider the question, so fully discussed, in the able and ingenious written argument of the counsel for the appellants, as to whether the title to the real estate which is the subject of controversy between the parties, was, at the time the agreement set out in the bill was entered into, vested in the complainants or defendant. Each claimed to have a valid legal title to the premises. This circumstance constituted the subject of difficulty between the parties. The complainants claimed title by virtue of the sale under the execution set forth in the pleadings; the defendants claim of title rested on the deed from Le Roy and wife to him. It is very clear, that if an action at law had been brought by either party against the other, the rights of one to the exclusion of the other would necessarily have been determined. No court could have sustained the title of either to a *portion* of the premises ; the one or the other would have succeeded to the *whole* estate. The doubt which manifestly

hung over the title, induced the parties to attempt an amicable adjustment of their differences. Each desired to avoid the vexation and expense of a protracted law suit. To compromise their difficulty, and avoid the consequences which would follow an exclusive assertion of title by either party, an agreement was entered into, by which each was to quit claim to the other a certain part of the premises. This was the mode resorted to by the parties to buy their peace, and constituted a good consideration for the agreement. It was the compromise of a doubtful claim. This of itself would constitute a sufficient consideration to support the agreement. The circumstance that such a compromise would save the parties the vexation and expense of a law suit, would also have been a good consideration for the agreement. I am not prepared to say, that if the title of the defendant to the land in controversy was clear and unquestionable, this court would carry into execution the agreement entered into between the parties; but enough is disclosed to show that a *doubt,* at least, existed; and this is all that is necessary to be shown to entitle the complainant to the relief he seeks, provided no other obstacle stands in the way of granting it. Instead of entering into a very critical examination, with a view to ascertain with certainty the *strict legal rights* of the parties, I have looked at the case simply to ascertain whether a *doubt* existed in respect to the title. Having satisfied my mind upon this point, I should have no difficulty in directing a specific execution of the agreement, if warranted by the principles of equity law. I hold it to be the duty of courts rather to encourage than discourage parties in resorting to this mode of adjusting conflicting claims; and I cannot agree that the nature or extent of the rights of each, should be nicely scrutinized. Courts should, so far as they can do so legally and properly, support agreements which have for their object the

amicable settlement of doubtful rights by parties; the consideration for such agreements, is not only valuable, but highly meritorious.    See 1 Russell 351 ; *Barlow* v. *Ocean Insurance Co.*, 4 Metc. 270.

It is said that the sale under the execution was *void ;* the property not having been sold in distinct parcels.    We have had occasion to dicide that when property was put up in distinct parcels, and not sold for want of bidders, the *whole* might be sold together.    The proceeding in the present case may have been irregular, and the defendants in the execution, or perhaps a third person claiming under them might have moved the circuit court to set aside the levy and sale, but it certainly does not become the defendant, after the having entered into a solemn agreement, with a full knowledge of all the circumstances, to set up this irregularity to defeat equitable rights acquired under that agreement.    The same remark will apply to all the objections urged against the regularity of the sale. It is apparent from the whole case made by the pleadings and proofs, that the defendant was fully advised of the existence of the impediments which he now urges as a ground of defence, for a long period previous to the making of the agreement set out in the bill.    He cannot complain that he was ignorant of any important fact in connection with the levy and sale.    The means of knowledge were at hand ; and if he did not avail himself of those means with a view to ascertain his legal rights, it was his only folly, and courts of equity do not sit to extend relief to parties who do not exercise common prudence and diligence in protecting their own interests and rights.    It would seem to me highly inequitable and unjust to permit the defendant, after having entered into an agreement with his eyes open, and after that agreement had been ratified by him subsequently, and repeated promises made to fulfil it, to come into a court of equity

and alledge his own laches and folly as a reason why he should not be held to a strict performance of all its stipulations. After a careful review and examination of the proofs taken in the case, I am satisfied, that an agreement was entered into between the parties, substantially as set out in the bill, and that it is the duty of this court to enforce its specific execution, unless some stern and inflexible rule of law stands in the way.

The principal ground assumed by counsel in favor of reversing the decree of the chancellor, is, that the agreement is void by the statute of frauds. The agreement was by parol, and unless there have been such acts of part performance, as take the case out of the operation of the statute, the decree below cannot be sustained. The 10th section of the chapter of the Revised Statutes of 1838 which treats of fraudulent conveyances and contracts relating to lands, is as follows : " Nothing in this chapter contained, shall be construed to abridge the powers of courts of equity to compel the specific performance of agreements, in cases of part performance of such agreements." Was there, then, a part performance of the agreement set out in the bill, and supported by the proofs. An answer under oath was waived, and by recurring to the positive testimony of Knight, Hunt and McConnell, I think it is shown very conclusively, that possession was taken by the complainants under the agreement, with the knowledge and assent of Terry. At the time the property was divided, Terry was in possession, and it would argue a singular disregard of his own interests to permit Knight to lease the premises and receive the rents and profits, without interposing an objection. His whole conduct can only be reconciled upon the supposition that he was satisfied with the agreement he had made, and that possession was given up pursuant to its terms. Again ; the taxes upon the property were paid by the complain-

Weed *v.* Terry.

ants, and a few dollars expended in repairs.   I think it is fully established that in order to carry out the agreement the defendant; first, made choice of an individual to divide the property ; second, actually attended and took part in the division ; third, delivered up possession of that portion which was set off to the complainants ; and fourthly, permitted the complainants to make repairs, lease the property, receive the rents and profits, and pay the taxes.   Shall it be permitted to him now to insist that the agreement should not be carried into specific execution ?   What acts in part performance of a parol agreement for the sale of lands, will take it out of the operation of the statute of frauds, has been a fruitful source of discussion, both in England and in this country.   The adjudged cases on the subject are very numerous, and it has been asserted by eminent persons who have practised much in courts of equity, that the decisions of some of the courts have tended to defeat the object and purpose for which the statute was passed ; that a new door had been opened to fraud and perjury.   It is not my purpose to review these decisions, or to vindicate their policy or impolicy. It may be that a rigid adherence to the provisions of the statute would have led to fewer evils than have been entailed upon us, by so great a departure from its terms. The rule as established by the great majority of cases, is, that the delivery of possession, pursuant to an agreement, is such an act of part performance as will avoid the statute.   *Willis* v. *Stradling*, 3 Ves. 378; *Boardman* v. *Mostyn*, 6 Ves. 467 ;  *Gregory* v. *Mighell*, 18 Ves. 328 ; 1 Sugd. on Vend. 116.   Per. *Marcy*, J., in *Harris* v. *Knickerbacker*, 5 Wend. 638.   The general rule, says Fonblanque, is, that the acts must be such as could be done with no other view or design than to perform the agreement, and not such as are merely introductory and ancillary to it.   The giving of possession is, therefore, to be considered as an

act of part performance. In this case, possession was not only given, but other acts are shown to have been done by the defendants in pursuance of the agreement; such as the selection of an individual to make division of the property, and being present and agreeing to the division when it was actually made. These acts of part performance, taken in connection with the other circumstances, such as expending money upon the premises; the payment of taxes; the subsequent express promise to and execute a deed of that portion of the premises allotted to the complainants, bring the present case clearly within the principles of the English and American decisions on this subject. Under this state of facts, it would operate as a *fraud* upon the complainants, if the relief prayed for can be successfully resisted. We do not wish to be understood as affirming that part performance of a parol agreement for the sale of land, will, in all cases, entitle a party to appeal to a court of equity to enforce its specific execution. It must not only appear by unequivocal proof that an agreement was made, such as is stated in the bill, but the acts of part performance must refer to, and result from the agreement so stated. If from the whole case a doubt should exist in respect to either of these facts, a court of equity will refuse to interfere; or, if it should appear that it would be inequitable or unjust to enforce an agreement, a court of equity will withhold its aid, and leave the party to his redress at law. In other words, courts of equity will exercise a sound discretion in granting or refusing a decree for a specific performance; they will apply, with great caution, the principles which have been long established, to the circumstances of each particular case that may come before them; and, while on the one hand, they will sustain the true spirit and object of the statute, they will also see that it is not made the instrument of fraud and perjury.

· But it is urged that the complainants were not bound by the agreement of Knight; he having no *written* authority to contract for them.   The proofs show that the proposition made by Terry was not assented to by Knight, but communicated by him for the acceptance or rejection of the complainants; that afterwards, the complainants accepted the proposition, and Knight was simply authorized to carry it into execution.   All that Knight did was to communicate the proposition; he did not undertake to make the agreement with the defendant in behalf of the complainants.   The deed from the complainants was executed by them, and not by Knight.   All the latter did, was to agree with the defendant upon some person to appraise and set off to each, his proportion, according to the terms of the agreement entered into between the parties. But even if Knight had no authority to do this much, his acts were ratified by the complainants, who executed a deed founded on the division made by McConnell.

I discover nothing in the proofs to warrant the belief that any fraud was practiced upon Terry by Knight, or that any was designed.   There is nothing in the testimony to indicate that Terry did not possess all the information necessary to put a prudent man on his guard.   If he did not possess all the knowledge and sagacity necessary to an understanding of his rights, it was his duty to resort to those who could enlighten him.   All the facts from which a knowledge of those rights might have been obtained were accessible to him, and if he did not choose to avail himself of the means of information within his power, and take counsel of those in whom he confided, it is his own folly, but not the fault of the complainants. But it does appear, affirmatively, that all the facts and circumstances in any way material were within his own knowledge, and that he did consult others in respect to the propriety of entering into the agreement.

It is next objected to the decree, that it directs the defendant to procure his wife to join in a deed with him, or to release her right of dower. It is charged in the bill that the defendant agreed that both he and his wife would execute a quit claim deed of the portion of land set off to the complainants. The only proof in support of this allegation is, that Knight called at the house of the defendant, with an officer, with a view to procure the execution, by Terry and his wife, of a deed which had been prepared; that not finding Terry in, they returned to the village of Pontiac, and, meeting with Terry, informed him that they had been to his house and the object of the visit. After some conversation, Terry requested that the deed be left with the officer, who might call at any time, and that he and his wife would execute it. This may be considered as sufficient proof of the allegation in the bill.

The authority of the court to direct the husband to procure a release of the dower of his wife may be well doubted. It is a question of much interest, and in respect to which there exists a diversity of opinion. Mr. Justice *Story* has discussed the subject with great ability; and, after a careful review of the leading cases, came to the conclusion that the authority did not exist. 2 Story's Eq. Jur. § 731 et seq. Cases are to be found, where a specific performance of a covenant entered into by the husband, that his wife shall levy a fine, or execute any other lawful conveyance, to bar her right in his estate, or in her own estate, have been decreed. In the case of *Hall* v. *Hardy*, 3 P. Will. 189, Sir *Joseph Jekyl* said: "There have been a hundred precedents, where, if the husband, for a valuable consideration, covenants that the wife shall join in a fine, the court have decreed the husband to do it; for that he has undertaken it, and must lie by it, if he does not perform it." In a note to this case it is said, "that the husband, when he covenants that his wife shall levy a

fine, has first gained her consent for that purpose ;" and
this presumption seems the foundation on which rests the
authority of the court to direct such a decree.   2 Story's
Eq. Jur. § 732.   "But this reason," (says Mr. Justice
*Story*,) "is a very insufficient one for so strong a doctrine;
for it may be a presumption entirely against the fact ; and,
if correct at the time, the wife may subsequently with-
draw her consent, and refuse, upon very proper grounds,
to comply with the covenant.   Let us suppose a case, in
which either there has been no consent, or it has been
withdrawn ; it may then be asked, and, indeed, it has
been asked, with the earnestness of just doubt, whether,
if it is impossible for the husband to procure the concur-
rence of his wife in such a proceeding, a court of equity,
acting according to conscience, will decree the husband
to perform what it is morally impossible for him to per-
form."   Lord *Cowper* refused to adopt the doctrine, say-
ing :  " It is a tender point to compel the husband, by a
decree, to compel his wife to levy a fine, though there have
been some precedents in the court for it.   And it is a great
breach in the wisdom of the law, which secures the wife's
lands from being aliened by the husband without her free
and voluntary consent, to lay a necessity upon the wife to
part with her lands, or,otherwise to be the cause of her
husband lying in prison, all her days."   *Outram* v. *Round*,
4 Vin. Ab. 203.   Lord *Eldon* condemned the doctrine in
strong and pointed language, saying :  " The policy of the
law is, that the wife is not to part with her property, but
by her own spontaneous and free will.   If this was per-
fectly *res integra*, I should hesitate long, before I should
say the husband is to be understood to have gained her
consent, and the presumption is to be made, that he ob-
tained it before the bargain, to avoid all the fraud, that may
be afterwards practised to procure it.   I should have hes-
itated long in following up that presumption, rather than

the principle of the policy of the law; for, if a man choose to contract for the estate of a married woman, or an estate subject to dower, he knows the property is her's altogether, or to a given extent. The purchaser is bound to regard the policy of the law; and what right has he to complain, if she, who according to law cannot part with her property but by her own free will, expressed at the time of that act of record, takes advantage of the *locus penitentiæ*: and why is he not to take the chance of damages against the husband? If the cases have determined this question so that no consideration of the absurdity that must arise, and the almost ridiculous state in which this court must, in many instances, be placed, can prevail against their authority, it must be so." *Emery* v. *Wase*, 8 Ves. 515, 516. It certainly would be highly impolitic, to place the husband in a position where he would have to adopt means to obtain a surrender of the wife's estate, "inconsistent with the harmony, peace and confidence of conjugal life." 2 Story's Eq. Jur. § 733. By our statute, the wife has an estate in dower in all the lands of which the husband may be seized during coverture. The manner in which she may devest herself of such an interest is provided for in clear intelligible language. It contemplates that every surrender of such interest, shall be the free and voluntary act of the wife, uninfluenced by any threats or coercion on the part of the husband. The justice, policy and equity of such a statute cannot be questioned; and this court cannot lend its sanction to a proceeding that may, in any wise, defeat its wholesome and salutary provisions. Numerous illustrations of the iniquity which might be practised upon the wife, if the doctrine contended for by the Master of the Rolls in 3 P. Will. 189, is to be supported, might be furnished. Suppose a husband is desirous of disposing of a valuable estate of which he is seized, either in his own right, or in

right of his wife. A deed is executed by him, in which the wife refuses to join. No earthly power can coerce her to execute the deed. To achieve his object, however, the deed is destroyed, and an agreement is entered into, by which he covenants that both he and his wife shall convey the estate upon certain conditions: the conditions being fulfilled, the wife still refuses to join in the conveyance : a bill for a specific performance of the covenant is filed against husband and wife : the former shows, by answer, his inability to comply with the covenant, and the wife's firm refusal to execute a release of her interest. Can it be that a court of equity will enforce such a covenant by compelling the husband to procure the wife's release ? . If it will, then the policy of the law, which will not sanction a violation of conjugal duties, and the express provisions of our statute, are both overthrown by force of a *presumption* entirely against the fact. Can it be that a *court of equity*, in such a case, would resort to chains and imprisonment to compel the wife to join in a conveyance ? Such a course of proceeding may have the desired effect ; for, a wife, bound to her husband by the ties and sympathies which ordinarily unite man and wife, would execute the conveyance, rather than that he should perish in a dungeon ; but it is apprehended that a coveyance, executed under such circumstances, would hardly be regarded as a free, voluntary act on her part, but an act rendered necessary by the situation in which a court of equity has placed her husband. That court have said, that you, (the wife,) must execute the conveyance, or we will imprison him, (the husband,) until you do. The wife may appear before the court, and acknowledge the conveyance, and may say that she does so freely and voluntarily, but who does not know that she acts under a *moral necessity* ? Who does not feel that such a proceeding is a mere mockery of justice ? And who does not see that it

is an engine by which either the interest or feelings of the wife are crushed ? I desire to see a law which protects the rights of the wife, maintained in its full spirit and vigor. I would not relax a hair's breadth, the rule by which the wife is protected against the fraud or indiscretion of the husband. I would not impair rights which secure her against the folly, vice or extravagance of the husband. I would not extinguish the hope, that that folly, vice or extravagance, cannot wrest from her and her children, a support in the night of adversity.

The decree is affirmed, except that portion which compels the husband to procure a release of the wife's right of dower.