## CALHOUN *vs.* CALHOUN.

In May, 1854, A and B sold and conveyed to C, with warranty of title, a plantation, fifty slaves and some chattels, and C, at the same time, gave to them his bond for the purchase money, amounting to $49,000, payable in installments, with interest; and to secure the payment of the bond, gave to them two mortgages—one of the plantation, and the other of the slaves. The slaves remained in the possession of C and his administrator, until 1865, when they were emancipated. On bill, filed in 1863, to foreclose the mortgage of the plantation : *Held*, that the administrator of C, was entitled to, no abatement, because of the emancipation of the slaves, and decree of foreclosure for the full amount of the debt was entered for plaintiffs.

When the Constitution of this State of 1868 was adopted and ratified, South Carolina was not a territory but a State within the Union, and bound, as such, by all the obligations which the Constitution of the United States imposes upon the States.

The acceptance by Congress of a State Constitution, as republican in form, does not give the force of law to provisions therein which the Constitution of the United States inhibits.

Section 34 of Article IV of the Constitution of this State of 1868, declaring all contracts, the consideration of which was the purchase of slaves, to be void, and providing that no suit shall be commenced, or prosecuted, for the enforcement of such contracts, and the Ordinance of January 30, 1868, containing the same declaration and provision, are State laws impairing the obligation of contracts, and, being inhibited by the Constitution of the United States, are void.

Notwithstanding said declarations and provisions, and the provision in the Act of August 20, 1868, " to organize the Circuit Courts," which excludes from transfer to the Circuit Courts of " all causes not cognizable therein under the Constitution," said Courts and the Supreme Court have jurisdiction to hear and determine suits to enforce contracts for the purchase money of slaves.

It is no breach of a warranty of title, contained in a bill of sale of slaves, that they were afterwards liberated by the Government, nor, to an action on a bond for the purchase money of the slaves, can such liberation be set up as a defence on the ground of failure of consideration.

A contract made in 1854, for the sale of slaves, being in conformity to public policy then existing, and legal and binding, was not invalidated by the subsequent emancipation of the slaves, and a change of public policy in reference to slavery.

One who purchased slaves and mortgaged them to secure the payment of the purchase money is not entitled to credit on the mortgage debt for the slaves lost by emancipation when in his possession.

Where a purchaser of land gives to the vendor, at the time of the purchase, and as part of the same transaction, a mortgage of the land, his widow is not entitled to dower therein until the whole mortgage debt be paid; and it makes no difference that only part of the debt was incurred for the purchase money of the land.

A homestead exemption cannot be claimed against a creditor whose debt was contracted for the purchase money of the land.

BEFORE JOHNSON, CH., AT PICKENS, JULY, 1866.

Appeal by defendants from the Circuit decree. The evidence was nearly all in writing, and the facts of the case, which were few and simple, are fully stated in the decree, which is as follows:

JOHNSON, Ch. On the 13th day of May, 1854, Floride Calhoun and her daughter, Cornelia M. Calhoun, sold and conveyed to Andrew P. Calhoun the Fort Hill plantation, in Pickens District, containing eleven hundred and ten acres, fifty negro slaves, and all the personal property on the plantation, with certain specified exceptions, for the sum of forty-nine thousand dollars. And, in payment of the same, they took the individual bond of Andrew P. Calhoun, to be paid as follows, that is to say: Forty thousand two hundred dollars to Floride Calhoun, and the remaining eight thousand eight hundred dollars to Cornelia M. Calhoun; the whole amount to be paid in fifteen years, from the first day of April, 1854, the payments to commence in ten years from the last date, and to be fully completed in five equal annual installments thereafter, with interest on the whole amount for the first ten years, at the rate of five and one-half per cent. per annum, "and, for the remaining five years, at the rate of three per cent. per annum upon the installments as they fall due; and for the purpose of securing the payment of the bond, and as a part of the same transaction, as is evidenced by the fact that all the papers bear the same date, and by a written agreement, entered into at the same time, by all the parties, Andrew P. Calhoun executed two separate mortgages, one for the Fort Hill plantation, and the other for the fifty negro slaves, each, by its terms, to secure the payment of the whole amount of the bond to Floride Calhoun and Cornelia M. Calhoun. The mortgage of the negro slaves is in the usual form, with a *proviso* in the words following, to wit: "That, if default shall happen to be made of, or in, any payments of the said debt, or sum of money aforesaid, according to the true intent and meaning of the said bond

and condition thereof, that then, and in that case, it shall and may be lawful to and for the said Floride Calhoun and Cornelia M. Calhoun, their executors, administrators, attorneys, or agents, from time to time, and at all times thereafter, peaceably and quietly to enter into any or all the mesuages, lands or tenements of the said Andrew P. Calhoun, and to take the said slaves into their custody and possession, and the same to hold and detain to their own use and behoof, as their own goods and chattels, from thenceforth and forever, or the same to sell and dispose of at will and pleasure, returning the overplus, if any there should happen to be, after paying the said debt or sum of money, with interest accruing, unto Floride Calhoun and Cornelia M. Calhoun."

There was some conflict of evidence upon the subject, but, upon the whole, I am satisfied that, in the trade, the plantation was estimated at fifteen thousand dollars, the fifty negro slaves at twenty-nine thousand dollars, and the other personal property at five thousand dollars, making, in the aggregate, forty-nine thousand dollars.

In 1856, Cornelia M. Calhoun died intestate, and, in February, 1866, Thomas G. Clemson took out letters of administration upon her estate. And, in March, 1865, Andrew P. Calhoun died intestate, leaving, as his heirs-at-law, his widow, Margarite M. Calhoun, and seven children, to wit: Duff Green Calhoun, John C. Calhoun, Margarite Calhoun, Andrew P. Calhoun, James E. Calhoun, Patrick Calhoun and Mary Lucretia Calhoun, an infant, who has since died. And his son, John C. Calhoun, administered upon his estate, which, like that of many others, was almost entirely swept away by the results of the late war; and the only property remaining for the payment of the bond, which is wholly unpaid, except the interest up to the first day of April, 1865, and of other debts, which, from an exhibit of the same, filed with the answer of the administrator, amount to as much, or more, than the mortgage debt, is the Fort Hill plantation, and about ten thousand dollars' worth of personal property. The bond is the only specialty debt due by the estate of the intestate, so far as is yet known.

The bill was filed on the 12th of March, 1866, for the purpose of foreclosing the mortgage on the Fort Hill plantation, for the payment of the whole amount of the bond. To this the defendant, Margarite M. Calhoun, objects, insisting that she is entitled to dower in the plantation, subject to the payment of the purchase money of the same, and not of the whole mortgage debt, and that the assets

in the hands of the administrator are first to be applied, in the regular course of administration, to the extinguishment of the mortgage; and that the Fort Hill plantation shall only be subjected to the payment of any deficiency of the amount of the bond, after the proceeds of the personal estate are applied, and after deducting that portion of the same which was given for the purchase money of the fifty slaves, which, for reasons hereinafter assigned, it is insisted, should not be paid. The cases of *Wilson* vs. *McConnell,* 9 Rich. Eq., 500, and *Hennegan* vs. *Harllee,* 10 Rich. Eq., 285, sustain the position that the personal estate is first to be applied to the payment of the mortgage debt, and that the land is only liable for the balance due. But the first proposition is not sustained by the authorities. A widow can only take dower in land, mortgaged by the husband at the time of the purchase, and as a part of the same transaction, subject to the payment of the entire mortgage debt, whether the same was in whole, or in part only, for the purchase money of the land, provided the same is recoverable at law.

But it is insisted by the defendants that the largest portion of the mortgage debt was incurred by the purchase of the fifty negro slaves, who have since been emancipated, and that the consideration of the bond, to that extent, has wholly failed. For more than ten years after the purchase, there was no complaint of any failure of consideration, and it is not now alleged that there was any intrinsic defect in the title when the bond was given. At the time, property in slaves, as in everything else, was subject to be destroyed by revolution; and it has been so destroyed. But did not the intestate buy them with the contingency distinctly before him that the institution of slavery might in a short time be abolished, either by a revolution in the Government or by constitutional amendment? It is well known that the value of slaves, at different times, was greatly affected by the political aspect of the country. And I think it may be safely taken for granted that, when the intestate made the purchase, he took the chances of emancipation into consideration, and paid such a price as he supposed the intrinsic value of the slaves, lessened by such chances, would justify him in doing.

From all the consideration which I have been able to give the subject, I can find nothing in the law which will justify me in disregarding the decisions in analogous cases, arising from the death or destruction of property, after it is sold, and before it is paid for, so far as to decide that the consideration of the bond, to the extent the same was given for the purchase money of the negro slaves,

has failed, and that the purchaser is not responsible for the same. In adhering to such decision as the rule, it may be that very great hardships will follow in many cases, but I am by no means certain that they would be fewer or less grievous if the contrary rule were adopted as the right one. But it is insisted that the institution of slavery was not abolished until it was done by our State authorities. If the State did the act freely, and not in compliance with the demands of an authority which she was forced to obey, then the owners of slaves might be justified in presenting claims against the State for their value, but not in refusing to pay the parties from whom they had purchased them the amount they had agreed to pay for them before their emancipation; and, if it were otherwise, it is strange that there has been no decision in any case arising out of the emancipation of slavery in the West India Islands, or in the Northern States, sustaining the position contended for; and, if such a rule were adopted in relation to executory contracts for slaves, it would be very difficult for Courts of Equity to stay their hands in executed contracts for them when the equities for relief would be precisely the same—except, perhaps, that the more grasping creditor had compelled payment by sacrificing the property of his debtor, when the more indulgent one had given time, as a special favor to the purchaser.

It is further insisted that, if the defense of a failure of consideration to the extent of the purchase money of the negro slaves be not sustained, the estate of the intestate is not now liable for the same, because the condition of the mortgage was broken before their emancipation, and, upon that being done, the legal estate in the slaves vested in the mortgage, and that, legally, the loss by their emancipation fell upon them, and not upon the mortgagor. It is true that, upon the condition of the mortgage being broken, the legal title to the slaves vested in the mortgagees, and they might, without any condition to that effect, have seized and sold them, and applied the proceeds to the payment of the debt, or they might have filed their bill to foreclose their mortgages, both on the land and the negro slaves, or they might have instituted suits at law upon the bond for the whole amount of the same.—2 Washb. on Real Prop., 592; 4 Kent, 183, and note 1. In the case of *Bryan* vs. *Robert*, 1 Strob. Eq. Rep., 342, the well established doctrine of this Court is stated by Chancellor Harper to be this, to wit: "In this Court, the mortgagee, though having the legal title, is not considered, in any manner, as the owner of the slaves, as, in a

Court of Equity in England, the mortgagee of land is not considered the legal owner.- He is regarded as having taken a pledge or security for his debt, with no view to the possession of the property itself. His object is merely the recovery of his money." And, by the provisions of the Act of 1712, the mortgagee must be in the actual possession of personal property for the space of two years after the breach of the proviso in the bill of sale, or other paper operating as a mortgage, before the absolute ownership of the property vests in him. And it has been decided, in the case of *Jackson* vs. *Willard*, 4 John. Rep., 41, that " the interest of a mortgagee before foreclosure is not the subject of sale or execution at law, notwithstanding the debt is due, and the estate has become absolute at law; and in the case of *Corell* vs. *Dolloff*, 31 Maine Rep., 104, that if the property in the possession of the mortgagor is destroyed, without any fault of his, he cannot be held to account for it. Upon condition broken, the legal title to personal property is permitted to vest in the mortgagee, for the purpose of enabling him the more readily to enforce his lien, and not for the purpose of compelling him to do so or lose his debt, in case the property may be destroyed. And the Court, in this case, cannot hold that the loss resulting from the emancipation of the slaves shall fall upon the mortgagees merely because they failed to enforce with haste one of their remedies for the payment of their bond, when the mortgagor might, at any time after his purchase, have sold the property, and paid the mortgage debt.

It is ordered and decreed that, unless the installments now due on the said bond, and all the interest that is due, (being computed according to the terms of the bond,) be paid on or before the first day of February next, that the said defendants do stand absolutely debarred and foreclosed of and from all equity of redemption of and in the said mortgaged premises, and that the Commissioner do sell the Fort Hill plantation, on the first Monday in March next, or such other time as may be agreed upon by the parties, at Pickens Court House, after giving at least twenty-one days' public notice of the sale, to the highest bidder, on a credit till the first day of November next, the purchaser to give bond and two or more good sureties—the title deed to be signed, but not delivered till the payment of the purchase money—and, if the money be not paid at the time it becomes due, then that the said plantation be resold, on saleday in December next, after the usual notice, to the highest bidder, for cash, at the risk of the former purchaser.

It is also ordered and decreed, that the creditors of the estate of Andrew P. Calhoun be enjoined from instituting suits at law, upon their claims against the same, and that they be required to come in before the Commissioner, and prove their demands against the said estate, on or before the first day of April next, and that the Commissioner will give two months' public notice to creditors, that they will be required to do the same.

And it is also ordered and decreed, that the question of emblements, and all other questions made in the pleadings, and not decided in this decree, be reserved until the coming in of the Commissioner's report; and that he do report the amounts due by the estate of the intestate, with leave to report any special matter.

The defendants appealed, and moved this Court to modify the decree in the particulars indicated in the following grounds:

1. It is respectfully submitted that the Chancellor erred in decreeing for the plaintiffs so much of the bond, $29,000, as was given for the slaves, which were afterwards emancipated, both by the Government of the United States, and the State of South Carolina.

2. Because the consideration of the bond, to the extent of the value of the slaves included in it, having failed, the title to said slaves having been destroyed, and the warranty of complainants broken by the *legal interference* of the Government, which has not only destroyed the title to the slaves sold, but declared such contracts, if made now, illegal and criminal, the judiciary of that Government should sustain the defence at least to the extent of refusing aid to enforce it, whilst executory.

3. It is respectfully submitted that the mortgage of the fifty slaves was a re-conveyance of them to the complainants, which, upon condition broken, became unconditional, and they were, at the time of emancipation, the absolute property of the mortgagees, both by law and the terms of the agreement. Their loss was the misfortune of the complainants, the owners, and, as a consequence, their value should have been credited as a payment and discharge, to that extent, of the bond for the purchase money.

4. Because the mortgagees were in default in not taking possession of the slaves mortgaged, after condition broken, and the representatives of the mortgagor were forcibly prevented by emancipation—the legal act of the mortgagees, through their Government—from delivering the slaves, in discharge of so much of said bond.

19A

5. Because the widow, Mrs. M. M. Calhoun, has a legal right to dower in " Fort Hill," subject only to the payment of the purchase money of said premises, which purchase money, being secured by mortgage, should have been directed to be first paid, in the order prescribed for the payment of debts.

6. Because, it is respectfully submitted that the decree is not only regardless of the history of the times, and the hardships involved, but contrary to the *law*, *justice* and *equity* of the case, and the public policy of the State.

*Harrison & Whitner,* for appellants.

*Noble,* for appellees :

1. Does Sec. 34, Art. 1, State Constitution, annul validity of contracts for the purchase of slaves? " No State shall pass any law impairing the obligation of contracts."—U. S. Const., Sec. 10, Art. 1. Contract perfect when made—danger of emancipation foreseen and dreaded—it was a danger incident to slavery—the buyer took the risk. Property in slaves recognized by U. S. Const., Sec. 9, Art. I. Repeal of the law prohibited, Art. V. Recognized by Congress in fugitive slave law, and, in 1862, freeing slaves in D. C., and compensating owners, under 5th Amend. U. S. Const.— 2 Brightly's Digest, 129, § 102.

2. Slavery, in one form or another, always existed. " Personal servitude appears to have been the lot of the greatest portion of mankind."—Hallam's Mid. Ages, Part 2, p. 89; 2 Kent Com., 246; *Williams, adm'r,* vs. *Johnson, adm'x,* Am. Law Times for Oct., 1869, p. 149. Recognized as a legitimate institution by Paganism, Judaism, by the followers of Christ, and of the Prophet.

3. Slavery in the insurgent States abolished by President's proclamation, Jan., 1863. The Government of the United States omnipotent during war. " The public safety" called for emancipation—right of *eminent domain* annexed to sovereign power, and by its exercise private property can be disposed of without compensation.—Vattel, 112. The sovereign takes by *prerogative,* and not by *title paramount.*—Black Com., Book 2, p. 239.

4. Government interference in the execution of contracts does not impair their validity or obligation.—*Atkinson* vs. *Ritchie,* 10 East., 530; *Sjoerds* vs. *Luscomb,* 16 East., 201; *Bright* vs. *Page,* 2 Bos. & Pull., 295; *Hardy* vs. *Clark,* 8 Term, 259; *Caradine* vs. *Jane,* Ibid; *Boyles* vs. *Fettyplace,* 8 Mass., 330; *Toutong* vs. *Hub-*

*bard,* 3 Bos. & Pull., 291; *Rose* vs. *McLeod,* 2 Bay., 108; *Stent* vs. *Bailis,* 2 P. W., 217; Loss produced by *vis major* falls on vendee or lessee.—Story Eq. Jurisp., § 101, *et seq.; Bullock* vs. *Dormit,* 6 Term, 650; *White* vs. *Nutt,* 1 P. W., 61; *Mortimer* vs. *Copper,* Bro. Rep., 156; *Paine* vs. *Miller,* 6 Ves., Jr., 349; *Rugg* vs. *Minott,* 11 East., 210; Story Eq. Jurisp., §§ 104, 1307; Sugden on Vendors, 174; 2 Powell on Contracts, 61, 70. These cases afford analogies.

5. The State Convention of 1868 acted on the belief South Carolina was not a "State of the Union." Congress did not indubitably speak out.—McPherson's Hand-book of Politics for 1868, pp. 191, 337, where Reconstruction Acts collected. The point settled 1869, in the case of *The State of Texas* vs. *White and others.*—Am. Law Rep., Lead Cases, 2 V., p. 84. The highest law tribunal in America held, notwithstanding the rebellion, Texas was at all times a "State of the Union." "No State shall pass any law impairing the obligation of contracts."—10 Sec., Art. 1, Const. U. S., and Art. 6; *Rutland* vs. *Copes,* 15 Rich. Law, 116; *Bank of Dubuque* vs. *State of Iowa,* 12 How., 1. Even doubtful, if Congress can.— *Hepburn* vs. *Griswold,* Am. Law Times, U. S. Court Rep., Feb. 1870, p. 29.

In 1862, Congress emancipated in D. C., under 5th Amend. of U. S. Const., and gave compensation for slaves as *private property.* 2 Brightly's Digest, 129, § 101.

In 1863, the Government of U. S. emancipated in insurgent States, under war powers, and for "the public safety."—Vattel, 112.

In 1865, the 13th Amendment U. S. Const. emancipated in Mo., Ky., and Md. But contracts for the purchase of slaves entered into while slavery was lawful, were left untouched, to be enforced by the Courts according to the common and statute laws of the country.

The opinion of the Court was delivered by

MOSES, C. J. The case before us is of interest to the community, from the large amount of debt which will be affected by its decision. We are impressed with its consequence, not only because our judgment will act upon pecuniary obligations of a great magnitude, but because important constitutional issues are necessarily involved in it.

No more delicate duty can be imposed upon a judicial tribunal than that which requires it to discuss questions in which the action

of those from whom it derives its own authority is to be' reviewed,' particularly where the enquiry into that action is to ascertain if it is in conflict with the Constitution of the United States. The Constitution of the State, acting directly upon the people, by whose delegates it was framed, and designed to guard and regulate their relations with their own internal government, will be sustained by the Court, unless the infraction of the Constitution of the United States is plain and manifest. If there is doubt, it should be resolved in favor of the State Government, because "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people." (Art. 10 of Amendments.) Where, however, the Constitution of the State, or an Act of the Legislature, plainly contravenes the Constitution of the United States, a Court would be false to every sentiment of duty and of principle, if it failed so to pronounce. The greater the interests at issue, the greater the necessity of interposing the shield of the judiciary to save the "supreme law of the land" from the blows which assail it. With these preliminary remarks, not, we hope, uncalled for, we will proceed to the case before us.

The Circuit decree sets forth the facts on which it rests, and these are not contradicted. It therefrom appears that the bond, the deeds and the mortgage constituted one transaction, and were cotemporaneously delivered. The consideration of the bond was negro slaves then sold, and the mortgage of the same slaves was given to secure it. The important question, therefore, first made, is, whether, under the Constitution and laws of South Carolina, a debt contracted in 1854, the consideration of which was slaves, is recoverable in her Courts?

The jurisdiction of the Court is objected to, and the ground of objection rests: First. On the Ordinance of the State Convention of 30th January, 1868, which ordains, "That all contracts, whether under seal or not, the consideration of which was the purchase of slaves, are hereby declared null and void, and of no effect; and no suit, either at law or in equity, shall be commenced or prosecuted for the enforcement of such contracts.

"Sec. 2. That all proceedings to enforce satisfaction or payment of judgments or decrees rendered, recorded, enrolled or entered upon such contracts, in any Court of this State, are hereby prohibited.

"Sec. 3. That all orders heretofore made in any Court in this

State in relation to such contracts, whereby property is held subject to decision as to the validity of such contracts, are also hereby declared null, void, and of no effect."

Secondly. On the 34th Section of Article 4 of the Constitution, framed by the same Convention, and afterwards ratified by the people, which is in the following words : " All contracts, whether under seal or not, the consideration of which were for the purchase of slaves, are hereby declared null and void, and of no effect; and no suit, either at law or equity, shall be commenced or prosecuted for the enforcement of such contracts; and all proceedings to enforce satisfaction or payment on judgments or decrees rendered, recorded, enrolled, or entered up on such contracts, in any Court of this State, are hereby prohibited; and all orders heretofore made in this State in relation to such contracts, whereby property is held subject to decision as to the validity of such contracts, are also hereby declared null and void, and of no effect."

Thirdly. On the Act "to organize the Circuit Courts," passed on the 20th of August, 1868, which, providing for the transfer to the said Courts of all causes pending in the Courts of Common Pleas and Sessions of the Provisional Government, and of all suits depending in the Courts of Chancery, excludes from such transfer causes which are "not cognizable therein under the Constitution."

If, by these several prohibitions, it was intended to impose limitations upon the general jurisdiction both of the Supreme and Circuit Court, as conferred by the State Constitution, they must be respected and obeyed, unless in conflict with that of the United States. It is further insisted, on the part of the appellants, that, even if the Court concludes that it has jurisdiction, the decree must be reversed, because slavery having been abolished both by the action of South Carolina, in her Convention of September, 1865, and by the Thirteenth Amendment of the Constitution of the United States, there was no consideration to support the contract now sought to be enforced, the warranty of the vendor having failed. Although the defense is presented in various forms and propositions, we think we have fully stated its substance and essence in the language we have employed.

The preliminary question and the general defense were submitted upon the same line of argument, and we shall, therefore, consider them together.

So far as it seeks to give supreme effect to the Section of the State Constitution declaring null and void all contracts the consid-

eration of which was for the purchase of slaves, etc., it rests on the supposed fact that South Carolina "had thrown herself out of the Federal Union," that she was, therefore, no longer subject to the Constitution of the United States, and never did become again so subject until she was re-admitted into the Union by the force of the Reconstruction Acts. That, after she was reduced by the power of the war until her re-admission, she stood in relation to the Government of the United States as a mere Territory, and when admitted under her Constitution of 1868, by the force of the Reconstruction Acts of Congress, "that Constitution, so established, is binding on the Judiciary of the country as the organic law of the State."

It is not to be denied that, under the fourth Section of the fourth Article of the Constitution of the United States, "it rests with Congress to decide what Government is the established one in a State," (*Luther* vs. *Bordon*, 7 Howard, 2,) and whether such Government is republican. These are political, and not judicial questions. So, too, are those relating to the admission of Senators and Representatives.

No one would contend that, if Congress refused to admit the Senators and Representatives duly elected from this State, a *mandamus* from any Court could compel it. Their political powers, even, cannot be exercised if in contravention of the Constitution. The idea, however, that, because Congress has the exclusive right to determine whether a State Government is republican, the ad mission of members into Congress, under a Constitution · previously submitted to it, no matter with what elements in such Constitution conflicting with that of the United States, so validates and con firms the instrument as to give supremacy over the Constitution of the United States, is not sustained by any authority, and we fail to discover the argument or reason which would recommend such a proposition to the approving judgment of any Court.

To admit that the State had lost by secession all its constitutional relations to the United States would be to affirm that the act of secession had dissolved the Union, and that the States composing the Southern Confederacy, by their attempted voluntary withdrawal, had, by a power reserved to them as States, thrown off the allegiance which they owed to the General Government. This has not been the view in which the secession of the States has been regarded by the Executive, Judicial, or Legislative Department of the United States.

President Johnson, in his special message (of December 4, 1865,)

to Congress, which was then holding its first session after the cessation of hostilities, says: "Besides, the policy of military rule over a conquered territory would have implied that the States, whose inhabitants may have taken part in the rebellion, had, by the act of those inhabitants, ceased to exist. But the true theory is, that all pretended acts of secession were from the beginning null and void. The States attempting to secede placed themselves in a condition where their vitality was impaired, but not extinguished; their functions suspended, but not destroyed."

· In *Texas* vs. *White et al.*, (7 Wallace, 726,) Chief Justice Chase (delivering the opinion of the Court) says: "Considered as transactions under the Constitution, the ordinance of secession adopted by the Convention, and ratified by a majority of the citizens of Texas, · and all the Acts of the Legislature intended to give effect to that ordinance, were absolutely null. They were utterly without operation in law. The obligations of the State as a member of the . Union, and of every citizen of the State as a citizen of the United States, remained perfect and unimpaired. It certainly follows, that the State did not cease to be a State, nor her citizens to be citizens of the Union. If this were otherwise, the State must have become foreign, and her citizens foreigners. The war must have ceased to be a war for the suppression of rebellion, and must have become a war for conquest and subjugation."

The decision in this case further affirmed propositions which are conclusive against the views of the appellants here. These, as it is said, are deduced from the duty imposed on the United States, after "suppressing the rebellion," "to re-establish the broken·relations of the State with the Union," "the authority for the performance of which is derived from the obligation of the United States, to guarantee to every State in the Union a republican form of government." So far was Texas from being considered, after she had laid down her arms, and before her full restoration to the Union, as a territory, subject to all laws which Congress might impose, she was held to be a State with a State Government, competent to sue in the Supreme Court of the United States, under the 2d Section of the 3d Article of the Constitution.

It is a mistake to suppose, as was averred in the argument, that the case of *Hepburn* vs. *Dundas et al.*, (2 Cranch, 446,) held "that the admission of Senators and Representatives in Congress has been the test and criterion by which States have been admitted." All that the Court there decided was, that the word "State' is

used in the Constitution as designating a member of the Union, and excluded from the term the signification attached to it by writers on the law of nations."

If the reconstruction of the States could only be effected by Congress in the exercise of its political power, it may be useful to consider in what light Congress did regard them, on the termination of hostilities. It was never urged, by any department of the Government, that the war was waged for the subjugation of the States which had confederated, that they might be reduced to the position of territories, or inferior dependencies, or denied that it was carried on for the purpose of restoring them to the Union, with guarantees and assurances that the attempt would not be repeated by either of them to dissolve a Union which it was proposed should be perpetual. As was said by Chief Justice Chase, in the opinion of the Court pronounced (during the war,) in the case of "*The Venice*," (2 Wallace, 258,) referring to the proclamation of the President of the 16th August, 1862, and the general conduct of the war: "It was a manifestation of a general purpose which seeks the re-establishment of the national authority, and the ultimate restoration of States and citizens to their National relations, under better forms and firmer guarantees, without any view of subjugation by conquest."

It is not easy to perceive, from the course of the Government of the United States, how a conclusion can be reached that the action of either of its departments, in relation to the State, before its full restoration, was intended to reduce it to a mere territorial existence.

The 13th Amendment to the Constitution of the United States was submitted to the Legislature of South Carolina for adoption as early as November, 1865, and was adopted by it during the same month. (House Journal of November, 1865, p. 93; Senate Journal, p. 74.) The certificate of its passage was signed and promulgated by Mr. Seward, Secretary of State, on the 18th day of December, 1865. (McPherson's Manual, for 1865, 1866, p. 6.) It is of interest to note the fact, that the Union was then composed of thirty-six States; the proposed amendment was ratified by exactly *twenty-seven*, the three-fourths required; West Virginia, Virginia, Arkansas, South Carolina, Alabama, North Carolina and Georgia, being of the number. The Amendment was recognized as ratified by every department of the Government.

In June, 1866, by Joint Resolution of both Houses, Congress

proposed the 14th Amendment. It was submitted to the *State* of South Carolina, and rejected by it on December 20, 1866. It failed to receive the vote of three-fourths of the States, all the States called " insurrectionary " having rejected it. (McPherson's Manual, for 1867, p. 194.) It is of consequence and significance, that the Congress of the United States did regard the said States in the Union at the time, for the most important act that a State, under the Constitution, could perform, the expression of its voice on a proposed amendment of that instrument. It is probable that this refusal on the part of the said States led to the Reconstruction Act of March, 1867, which made the acceptance of the said amendment one of the conditions on which " the rebel States " were to be declared entitled to representation in Congress.

· If we follow the various clauses of the Reconstruction Acts, we will not find any expression on the part of Congress, in regard to the " rebel States," which places them in relation to the general Government as conquered provinces or territories. Indeed, such an assumption by Congress would have falsified the oft repeated declaration, that the war was not intended for subjugation any further than it was necessary " to re-establish the national authority, and the ultimate restoration of States and citizens to their national relations, under better forms and firmer guarantees."

The 4th Section of the 4th Article of the Constitution requires " that the United States shall guarantee to every State in this Union a republican form of Government." It may be that in the exercise of this power Congress exceeded the limit of the authority that the framers of the Constitution intended to confer. The design of Congress, as expressed in the preamble, was " to enforce peace and good order in said States until loyal and republican State Governments can be legally established." Throughout the Act, as well as in the preamble, they are referred to as States. So far from any indication on the part of Congress to assume unlimited power in regard to the character of the Constitutions which they should enact, it required that such Constitutions should be " in conformity with the Constitution of the United States in all respects," and when the provisions of the said Acts were fully complied with, what was to be the· consequence? Was South Carolina to be admitted as a State in the Union? or never, in the contemplation of Congress, having been, by her act of secession, out of the Union, though in armed hostility to it, she was, by the Act, " to be declared entitled to representation in Congress," and her voice was again to be heard

in the family of the States by her representatives assembled in the halls of the National Legislature.

In this connection it may be of interest to refer to the case of *The State* vs. *Carew*, decided in May, 1866, by the Court of Errors of this State. The weight of its authority against the proposition of the appellants will be estimated when it is remembered that the result of it was to declare null and void Acts of the Legislature, passed in December, 1861, and December, 1865, because they were in conflict with the Constitution of the United States. This Court, the highest of authority then in the State, held that an Act passed by the Legislature while South Carolina, as one of the Confederate States, was in hostile array to the United States, was void, because violative of that very provision of the Constitution of the United States which we are now endeavoring to enforce and sustain.

The argument on the proposition of the appellants as to the unlimited power of Congress over the Constitution of 1868, presented and accepted under the Reconstruction Acts, goes, without disguise, to this extent, "that when the Constitution adopted by the State becomes the Constitution which is recognized by Congress, and when Senators and Representatives are admitted under that Constitution, the matter is complete, and the Constitution so established is binding on the Judiciary as the organic law of the State."

It is probably not a matter of wonder or surprise that the consequences of the war, which has wrought so many changes, should have worked so material an alteration in the political sentiments of the South, which once denied to the General Government any powers except those expressly ceded to it in the Constitution, and pressed the doctrine of State rights to the extent of insisting that the citizens of a State owed no allegiance to the United States save that which it owed through the State. A power is now claimed for Congress by the argument so omnipotent that it would virtually destroy all the safeguards which protect the Constitution from total annihilation at the hands of Congress. Let the argument be illustrated by the suggestion of an example: Suppose the Constitution adopted by the State, and accepted by Congress, had provided "that the State should have the power to impair the obligation of contracts," "or that the State should coin money," would it, for a moment, be contended that the Judiciary would be estopped from declaring either of them obnoxious to the Constitution of the United States, and, therefore, of no force or effect?

Even conceding, as was held in *Evans* vs. *Eaton*, (Pet. C. C. R., 337,) that "there is nothing in the Constitution of the United States which forbids Congress to pass laws violating the obligation of contracts," can Congress empower a State to pass such laws? If it can, then all the prohibitions of the Constitution of the United States in regard to the powers of a State are worth nothing, if that which *is* not permitted to the States under the Constitution can thus be done by the license or consent of Congress, although Congress, even, has no right to amend it, (Const. U. S., Art. V,) and can only, by a two-thirds vote of both Houses, propose amendments to be ratified by the Legislatures or Conventions of three-fourths of the several States, or on the application of the Legislatures of two-thirds of the several States, call a Convention for proposing amendments to be ratified in the same way. Without, then, any power on its own part to amend, the authority is claimed for it to change, vary or destroy an Article of the Constitution, provided it can find the opportunity to second and confirm the unlawful Act of a State when it is called upon to pass on its Constitution.

If the right is to be referred to the guarantee power, that was intended for the safety and protection of the State, that a Republican form of Government, the only one recognized by the Constitution itself, should be secured, and which form each State has the right to demand shall be insured to it.

The whole argument proceeds upon the ground that Congress can authorize a State to violate the Constitution of the United States, provided that it does so by passing on a State Constitution and accepting it, though it contains provisions in direct antagonism to such Constitution.

If it can, what becomes of that clause in the said Constitution which declares (Const. U. S., Art. III,) "that this Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the Judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding?" And what becomes of the twentieth Section of that very State Constitution claimed to have been impressed with infallibility by the hands of Congress, which requires "all officers, before they enter on the duties of their respective offices, and all members of the Bar, before they enter on the execution of their duties, to solemnly swear (or affirm) that

they recognize the supremacy of the Constitution and laws of the United States over the Constitution and laws of any State?"

The 34th Section of the 4th Article of the Constitution of 1868, without declaring the contracts illegal or immoral, proscribes them as null and void, and of no effect; prohibits suits for their enforcement, and proceeds to the extent of prohibiting proceedings for the payment of judgments already rendered. Its contemplated purpose appears to have been two-fold—first, to affect all existing contracts where the consideration was the purchase of slaves, even if the agreement had been merged in, and consummated by, a judgment; and, secondly, to deprive the party in whose favor such a contract had been entered into, of all remedy in the Courts of South Carolina to enforce it.

Mr. Cooley, in his valuable Treatise, well expresses "the power of the people to amend or revise their Constitutions," (Cooley on Const. Lim., p. 33,) by saying "that it is limited by the Constitution of the United States in the following particulars: First. It must not abolish the republican form of government, since such act would be revolutionary in its character, and would call for and demand direct intervention on the part of the Government of the United States.  Second. It must not provide for titles of nobility, or assume to violate the obligation of any contract, or attaint persons of crime, or provide, *ex post facto*, for the punishment of acts by the Courts which were innocent when committed, or contain any other provision which would, in effect, amount to the exercise of any power expressly or impliedly prohibited to the States by the Constitution of the Union.  For, while such provisions would not call for the direct and forcible intervention of the Government of the Union, it would be the duty of the Courts, both State and National, to refuse to enforce them, and to declare them altogether void, as much when enacted by the people, in their primary capacity as makers of the fundamental law, as when enacted in the form of statutes through the delegated powers of their Legislatures."

The 10th Section of the 1st Article of the Constitution of the United States declares "that no State shall pass any law impairing the obligation of contracts." The prohibition is not confined to acts or resolutions of the legislative bodies of a State, but is against the exercise of the forbidden power by a State. It is the State, no matter by what body represented, which is subjected to the restraint.

It was, therefore, held in *Cohens* vs. *Virginia,* (6 Wheat., 414,) in

which the opinion was pronounced by Chief Justice Marshall, "that the Constitution and laws of a State, so far as they are repugnant to the Constitution and laws of the United States, are absolutely void." (See, also, *Dodye* vs. *Wolsey*, 18 How., 331.) It was upon the same principle that the Supreme Court of the United States proceeded in the more recent case of *Cummings* vs. *The State of Missouri*, (4 Wal., 277,) which held that certain clauses of the Constitution of Missouri adopted in 1865, were null and void, because repugnant to the Constitution of the United States. .

Are the Ordinance of the Convention and the said Section of the Constitution, together with the clauses of the Act of 1868, already referred to, obnoxious to the tenth Section of 1st Article of the Constitution ?

When the contract was entered into, it had the binding efficacy which the law accords to a contract, not wanting any of the incidents to make it a perfect and complete agreement. The contract vested "certain definite, fixed, private rights of property," (*Butler* vs. *Pennsylvania*, 10 How., 416,) and was of the character of those within the meaning of the Constitution.

To impair the contract the action of the State must be upon and in regard to it.—*Charles Riv. Br.* vs. *Warren Br.*, 11 Pet., 581. The purpose of the Convention in this Article of the State Constitution admits of no doubt. The contract itself was the immediate subject of action, and whether "it was executed or executory," was protected by the said provision of the Constitution of the United States.—*Green* vs. *Biddle*, 8 Wheat., 92.

In the many interesting cases which are to be found in the Reports, in which this important provision of the Constitution of the United States is brought into discussion, we have not found, in our investigation, a single one where the question arose upon the entire destruction of the contract, so declared in express terms by State authority. Where it is attempted to expunge the whole contract, to make it "null and void," it would be a waste of words to enquire if the obligation is impaired. The cases almost exclusively relate to the effect on the obligation of the contract, through the remedy by which it is to be enforced. As the said Section of the State Constitution also forbids the prosecution of any suit for the enforcement of such contracts, or for satisfaction of judgments founded on them, it may be proper to enquire into the force of this prohibition as impairing the obligation of its action or effect on the remedy. This branch of the subject has been so fully examined by the late

Court of Appeals, that it would be but a repetition of what has been so well expressed in its opinion in the case of the *State* vs. *Carew*, (13 Rich., 498,) and but a reference to the same authorities which led to the conclusion to which it arrived.

The Constitution of 1868, by the 15th Section of the 4th Article, gives "exclusive original jurisdiction to the Circuit Courts in all civil cases which shall not be cognizable before Justices of the Peace." This general grant covers the right of action on a bond for the payment of money. The Supreme Court, by the 4th Section of the same Article, "has appellate jurisdiction only in cases of Chancery, and is constituted a Court for the correction of errors at law."

The whole judicial machinery through which justice was to be administered was fully furnished by the Constitution, so that the provision of the 15th Section of the Bill of Rights, securing " to every person a remedy by due course of law for any injury he may receive in his lands, goods, person or reputation," should not be a mere delusion. These provisions cannot be deprived of their full force and power, either by the Ordinance, the 34th Section of the 4th Article of the Constitution, or the provisions of the Act of 1868, because they so affect the remedy as to render worthless the obligation which can alone be enforced through it.

Our judgment being, that there is nothing in the Constitution or laws of South Carolina which forbids the Circuit Courts, or this Court, from entertaining cases of the character of the one before us, it becomes necessary to consider the other grounds presented by the defence.

Is there such a breach of warranty on the part of the vendors as will discharge the defendant from the payment of the bond?

The covenant of warranty must be construed according to the intent of the parties, to be collected from its terms.— *Woodhouse* vs. *Jenkins*, 9 Bing., 701; *Browning* vs. *Wight*, 2 B. & B., 14. It extends to and covers nothing but what is expressed in it. *Stanard* vs. *Forbes*, 6 A. & E., 572.

What is the covenant here: "against ourselves, our heirs, and against every person whomsoever lawfully claiming, or to claim the same, or any part thereof."

The persons sold were slaves at the time, and the title was in the vendors when they conveyed to the purchaser. The covenant extended to the title and soundness. It was no more than a warranty that they should never be lawfully claimed, and taken from the pos-

session of the vendee as slaves by a better title than that held and conveyed by the vendors, in analogy to the principles which apply to eviction from real estate by paramount title. Has that condition been broken? Has a better title deprived the defendant of the possession of the slaves?

In the case of *Watkeys* vs. *DeLancey*, (2 Doug., 354,) where the words of the covenant were "lawfully seized in his own right of a good estate in law, in fee simple, in the premises," Lord Mansfield said, " the defendant covenants that he is seized in fee of the land in question by all the laws in being."

In *Noble* vs. *Kind and Smith*, (1 Hy. Bl., 34; see also *Ex'ors. of Greencliffe* vs. *W.*, 1 Dyer, 42,) on a covenant " against any person whatsoever," it was held that a breach must be shown by a title *in esse* prior to the covenant.

The emancipation of slaves by governmental authority was a possible contingency which must be assumed, from the peculiar character of the property, to have been understood by the parties treating for their sale and purchase. A warrantor of title is an insurer of it against all lawfully claiming by a better one. Emancipation, whether the act of the United States or the State, does not change the title by vesting it in another, but, in effect, declares that those on whom it operated shall not be the subject of property.

A covenant for quiet enjoyment of real estate is not broken by any action of the supreme authority of the State. The doctrine of eminent domain is usually restricted to real estate, or corporeal franchises, but the principle upon which it is based may be well applied by analogy to any species of property. Indeed, Vattel says, "everything in the political society ought to tend to the good of the country; and, if even the citizen's person is subject to this rule, their fortunes cannot be excepted.—1 Bk., ch. 20, p. 171. If the State can exercise dominion over the land, why not over every species of property held by the individual? If the right is inherent in the Government, how is it to be limited to a particular kind of property, excluding every other?

McKinley, J., in *Pollard's Lessee* vs. *Hogan*, (3 How., 233,) says: "The right which belongs to the society, or to the sovereign, of disposing, in case of necessity, and for the public safety, of all the wealth contained in the State, is called the eminent domain."

Mr. Justice Daniel, in the *West River Bridge Co.* vs. *Dix, et al.*, (6 How., 532,) says: "Under every established Government, the

tenure of property is derived, mediately or immediately, from the sovereign power of the political body, organized in such mode, or exerted in such way, as the community or State may have thought proper to ordain. It can rest on no other foundation, can have no other guarantee. It is owing to these characteristics only, in the original nature of tenure, that ·appeals can be made to the laws either for the protection or assertion of the rights of property. Upon any other hypothesis, the law of property would be simply the law of force. Now, it is undeniable that the investment of property in the citizen by Government, whether made for a pecuniary consideration or founded on conditions of civil or political duty, is a contract between the State, or the Government, acting as its agent, and the grantee; and both the parties thereto are bound in good faith to fulfil it. But in all contracts, whether made between the State and individuals or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the pre-existing and higher authority of the laws of nature, of nations, and of the community to which the parties belong; they are always presumed, and must be presumed, to be known and recognized by all, are binding upon all, and need never, therefore, be carried into express stipulation, for this could add nothing to their force. Every contract is made subservient to them, and must yield to their control as conditions inherent and paramount whenever a necessity for their execution shall occur. Such a condition is the right of eminent domain."

To whatever immediate cause emancipation is to be referred, it is not to be denied that it was effected by a power to which the citizen was bound to yield obedience, and which he could not resist.

As early as the summer of 1865, almost every County in the State was garrisoned by troops of the United States, and, wherever they went, they gave practical effect to the proclamation of President Lincoln. The amnesty proclamation of President Johnson, in May, 1865, required of the citizen an oath recognizing and promising support to the *laws* and proclamations which "have been made during the existing rebellion with reference to the emancipation of slaves." The State Convention of September, 1865, was composed of members who had subscribed the said oath; and so impressed were they with the fact that the institution of slavery had passed away by the "action of the United States authorities," (Constitution of September, 1865, Sec. 11, Art. III,) that, in the

Constitution which they framed, a clause was included prohibiting the re-establishment of slavery, and referring its abolition to the said authorities.

The Court of Errors, in the case of *Picket* vs. *Wilkins et al.*, (December, 1867,) held " that slaves in this State did not become either *de jure* or *de facto* free until 1865, when they were emancipated by the action of the United States authorities."—13 Rich. Eq., 366.

The ratification by the State of the 13th Amendment of the Constitution of the United States, was only repeating in a different form what it had done in the most solemn manner through the Constitution of 1865.

It was contended, by the defendants, that every act of the Government is to be regarded as the act of every citizen, and that the plaintiffs here contributed to the loss of the property by emancipation. What, on the other hand, is to be said of the participation of the purchaser who, by his aid, contributed to deprive the warrantor of the power to perform his covenant ? This doctrine, however, has not been recognized in this country, (2 Hall's Am. L. J., 230 ; 5 John., 318,) it being considered by our Courts as too refined and fanciful to be safely applied to the common transactions between man and man.

The defence of subsequent failure of consideration cannot avail the defendant. If the covenant of warranty was not broken, it is difficult to perceive how the appellants will be entitled to an abatement of the bond by reason of an alleged failure of consideration. Conceding, however, that it may be submitted as a defence independent of that of covenant broken, if the event which induced the failure was contingent from the nature of the article sold, and to which the agreement was subject, there cannot be said to be such a failure of the consideration as to cast the loss on the vendor. If there was no such failure at the time of the contract, how can he be responsible for any loss which accrued by after occurring circumstances, against which his covenant cannot be held to extend ?

The argument against the legality of the contract cannot prevail. If it was illegal when entered into, no Court will give it effect. If the cause of action grows out of a transgression of a positive law, it would not be enforced, because the very claim which would be preferred for the favor and protection of the Court would be in contravention of the law itself. It is not pretended that this contract was illegal when it was made. On the contrary,

20a

the whole defence rests on the force of subsequent events, through which it is attempted to impair what, at the time, was a legitimate and lawful transaction, sanctioned and sustained by the laws and usages of the State for centuries.

Nor can the revovery be resisted on the ground that the agreement was against public policy. This, says Mr. Story, in his work on Contracts, (Sec. 546,) "is, in its nature, so uncertain and fluctuating, varying with the habits and fashions of the day, with the growth of commerce and the usages of trade, that it is difficult to determine its limits with any degree of exactness. It has never been defined by the Courts, but has been left loose and free of definition, in the same manner as fraud. This rule may, however, be safely laid down, that whenever any contract conflicts with the morals of the time, and contravenes any established interest of society, it is void, as being against public policy."

If what constitutes the "public policy" of a State is to be ascertained by the general sentiment which pervades its constitution and laws, indicating the opinion of the people which prescribed them, as the rule by which they were to be governed in their relations to the Government and to each other, then the contract before us is consistent with the public opinion which prevailed in South Carolina when it was entered into.

Considerations of public policy cannot affect the judgment of a Court, unless expressed in a shape which will be binding upon it. If they are carried out by the legislative will in the form of law, they will be received as mandatory. The condition of any people would fail in that security which gives value to property and contracts, if the decisions of its Courts were to be regulated by the vague and undefined notion of those who administer justice, in regard to what, from time to time, may constitute the "public policy" of the State.

To excuse or defeat the performance of a contract, lawful when it is entered into, it is not only necessary that a change in the public policy of a State should intervene, but it must prevent the performance of the contract, and this was the ruling in *Touteng* vs. *Hubbard*, (3 B. and P., 291,) so insisted and enlarged on in the argument. The same principle is reflected in *Blackman* vs. *Garman*, (1 Rich. Eq., 161,) and in *Finley* vs. *Hunter*, (2 Strob. Eq., 214,) referred to by the counsel.

For upwards of two centuries slavery existed in South Carolina, owing its origin to no statutory provisions, but regulated from

time to time by local laws regarded necessary and proper for its government.

It existed as a common law institution, for the title by which it was held could neither be definitely or distinctly traced to time or person. Although it was not recognized by the common law of England, still it lawfully prevailed in her American colonies. When the Union was established, it was recognized as a distinct institution, and continued to prevail in many of the States which composed it, and it was alone dissolved as a result and consequence of the late war. Slaves, in South Carolina, when this contract was made, were the legitimate subjects of sale and purchase.

To impeach such a transaction now as illegal, or against public policy, is not only to ignore the history of the State in regard to the institution, but to view the events of the past by the reflected light of the present day.

It is further contended by the appellants " that the mortgage of slaves was a re-conveyance of them to the plaintiffs, which, on condition broken, became unconditional, and that at the time of emancipation they were the absolute property of the mortgagees, both by law and the terms of the agreement; that their loss was the misfortune of the plaintiffs, the owners; and, as a consequence, their value should have been credited as a payment and discharge to that extent on the bond for the purchase money."

Throughout the argument for the appellants, it has been assumed that the contract, taken as a whole, growing out of all the transactions " make one *res gesta*"—" one contract"—which is executory. So far as relates to the sale of the slaves, the title to which vested in the purchaser by the deed, the contract was executed, as was the consideration given, by the vendor for the bond of the said purchaser, and nothing in the whole matter remained executory but the payment of the bond.

The legal title to personal property conveyed by mortgage vests in the mortgagee, but the breach of the condition does not confer so absolute a right as to give a perfect and independent claim to the chattel, as one holds property subject alone to his own control and dominion. Even if he has possession of the article, his title is divested on the payment of the debt, and transferred to the mortgagor. His possession, if he has it, is a qualified one, and though he may be clothed with a mere legal title, he is a trustee for the mortgagor, who still continues to hold the equity of redemption, and who has the real and beneficial interest.

Ch. Johnston, in *Black & Hair* vs. *Hair*, (2 Hill Ch., 624,) says: " A creditor holding a mortgage security is a trustee, to sell not only for the benefit of the mortgagor, but for his own use."

" The interest which attaches to property held by one in absolute right, is not of that character which belongs to a mortgagee when in possession before foreclosure. One thus holding, would be accountable for the actual receipt of rents and profits."—4 Kent, 166.

In *Bryan* vs. *Roberts*, (1 Strob. Eq., 342,) Chancellor Harper thus states, the established doctrine: " In this Court the mortgagee, though having the legal title, is not considered in any manner as the owner of the slaves, as in a Court of Equity in England the mortgagee of land is not considered the legal owner. He is regarded as having taken a pledge or security for his debt with no view to the possession of the property itself. His object is merely the recovery of his money."

It would be a contradiction of the purpose of the whole transaction here to say that the vendor actually disposing of the slaves had " a view to their absolute possession," except as a security for his debt. If his right is absolute because he has the legal title, how could the mortgagor compel redemption after condition broken— and this, within a reasonable time, he may do—or why, if the mortgagee sells, does he hold the proceeds beyond the amount necessary for the payment of his debt for the benefit of the mortgagor ? It is because the mortgage, in fact, is but a security for the debt. Ch. Kent, in the 4th Vol. of his Commentaries, (p. 160,) remarks, that " the Courts of law have also, by a gradual and almost insensible progress, adopted the equitable views of the subject, which are founded in justice, and accord with the true intent and inherent nature of every such transaction." The doctrine contended for in the argument would narrow and restrict the right of redemption, which, for centuries, it has been the aim of the Courts to extend and protect.

It was to this end that the Act of 1712 (2 Stat. at Large, 587,) provided that where possession of the chattels, subject to the right of redemption upon performance of the proviso contained in the mortgage, continues in the mortgagee for two years after breach of the proviso, without redemption, the said chattels vested in the mortgagee as his own proper goods forever. In the face of this statute, can it be declared that where the possession, after condition broken, continues with the mortgagor, that an unqualified

legal title, conferring the absolute beneficiary interest, is in the mortgagee?

In relation to the question of dower, this Court concurs with the Circuit Chancellor.

The claim under the Homestead Law is expressly excluded by the language of the Constitution, which declares "that no property shall be exempt from attachment, levy or sale for taxes, or for payment of obligations contracted for the purchase of the said homestead, or the erection of improvements thereon."—Art. II, Sec. 32.

The decree of the Chancellor is affirmed, and the motion is dismissed.

It is ordered and adjudged that the case be remanded to the Circuit Court of Pickens County, that the time of sale for foreclosure, under the order of the Chancellor, may be prescribed, as also the terms thereof, and for such orders as may be necessary to give effect to the judgment now pronounced. Any questions made in the pleadings, and not decided by the decree, to be passed upon by the said Circuit Court.

*Willard*, A. J., and *Wright*, A. J., concurred.